**EMPIRE FIRE AND MARINE INSURANCE COMPANY**

v.

**BANC AUTO, INC., Patrick Figueroa, Individually and t/a Car Mart, VA, Euro Motorcars, Inc.**

**Appeal of Euro Motorcars, Inc. ("Euro").**

Superior Court of Pennsylvania.

Argued Feb. 14, 2006.

Filed April 19, 2006.

**1248**

John B. Consevage, Harrisburg, for appellant.

Jeffrey S. Saltz, Philadelphia, for Banc Auto, appellee.

BEFORE: TODD, KLEIN, JJ. and McEWEN, P.J.E.

OPINION BY KLEIN, J.:

¶ 1 Euro Motorcars (Euro) appeals from the judgment entered on November 10, 2004, in the Court of Common Pleas of Delaware County. Empire Fire & Marine Insurance (Empire) filed a declaratory judgment action to determine its obligations to its insured, Banc Auto, Inc. (Banc), regarding a series of transactions involving Banc, Euro and Patrick Figueroa (Figueroa), a middleman. Banc and Euro also filed cross-claims against each other as well as against Figueroa. The trial court determined Banc was entitled to the proceeds from the sale of the automobile in question. Euro claims numerous errors by the trial court. After a thorough review of the submissions by the parties, the official record and relevant law, we affirm.

¶ 2 On July 10, 2001, Euro Motorcars, a car dealership located in Bethesda, Maryland, acquired a 2000 Mercedes–Benz S430 in trade for another car. On July 12, 2001, Euro contacted Figueroa regarding the car. Euro knew Figueroa as an authorized agent for two other car dealers, Maygoun Auto Sales (Maygoun) and Car Mart. Euro had dealt successfully with Figueroa on many prior occasions. Figueroa expressed interest in buying the Mercedes on behalf of Maygoun. Euro agreed to sell the Mercedes to Figueroa for $56,500. Euro allowed Figueroa to take the car without making any payment. It was understood that once Figueroa tendered payment to Euro, Euro would turn over the title to the vehicle.

¶ 3 Rather than selling the car to Maygoun, Figueroa decided to sell the car to Banc, a car dealership located in Manheim, Pennsylvania. Banc has also successfully done business with Figueroa on prior occasions. Figueroa agreed to sell the car to Banc for $56,500 plus a percentage of Banc's ultimate profit in reselling the vehicle. Banc ultimately issued a check at Figueroa's instruction made out to Car Mart. Figueroa then cashed the check and, fairly obviously, never paid the money over to Euro. Because Euro never received payment for the car, it refused to

turn over the title to the vehicle. Because Banc did not receive the car's title, it could not resell the car and instead, used the vehicle for its own benefit for approximately two years, until the car was sold by court order for $40,000.

¶ 4 When it realized it had been had, Banc filed charges against Figueroa. Figueroa was eventually convicted and has made $10,000 in restitution payments to Banc. Meanwhile, Empire, Banc's insurer, filed this declaratory judgment action, naming Banc, Euro and Figueroa as defendants. The previously mentioned cross-claims were then filed. Empire eventually settled with Banc and agreed to pay Banc $30,000, but retained subrogation rights. Ultimately, the trial court ruled in favor of Banc, awarding it the proceeds from the sale of the car.

## Discussion

¶ 5 Euro now raises six issues on appeal. Those issues and our summary discussion are as follows:

1. **The Court erred in finding that Banc was the lawful owner of the Mercedes and therefore that Banc was entitled to monetary damages.**

■ ¶ 6 Since Figueroa was given possession of the car by seller Euro, he had voidable, not void, ownership. This is unlike the situation in *In re Hennessy*, 343 Pa.Super. 293, 494 A.2d 853 (1985). Therefore, Figueroa had the ability to sell the car to Banc. Also, rather than stealing the car, essentially Figueroa stole the check from Banc.

2. **The Court erred in failing to find that Figueroa unlawfully converted or stole the Mercedes from Euro and therefore he could not pass legally cognizable title to Banc Auto.**

¶ 7 As discussed above, Figueroa did have the authority to sell the Mercedes to Banc. He just did not have the authority to steal the check from Banc which should have been given to Euro. Moreover, there is no showing in the record as to *when* Figueroa formed the intent to commit a theft. It well might have been that at the time he took possession of the Mercedes from Euro, he planned to go through with a legitimate transaction, and it was only later that he formed the intent to commit a theft.

3. **The Court erred in finding that Banc Auto was a good faith purchaser for value without notice of a defect in title.**

■ ¶ 8 The Court found that transactions of this kind are routine in the trade, and it was usual to give possession of a car to a middleman and only transfer title after the check is paid. Therefore, there is nothing to show anything unusual about this transaction that would disqualify Banc from being a good faith purchaser for value.

4. **The Court created a windfall for Banc Auto by allowing it to recover the full amount of its alleged monetary loss ($56,500) plus retaining the value of the possession and use of the Mercedes (around 20,500 miles) during the period of time from when it was in possession of the car and until the Court ordered the sale (1–1/2 year period).**

¶ 9 A car depreciates in value as it gets older. There is no showing by Euro by way of expert testimony or otherwise as to how much of the decline in value from $56,500 to $40,000 was due to the extra mileage put on the car rather than passage of time. The Court would be left to speculate as to what percentage was attributed

to the mileage. Likewise, this would be offset by lost profits on the car. There is nothing to show that Banc is still not out of pocket at least $6,500, the difference between the amount of the check and the recovery.

**5. The Court failed to consider payments made from Empire to Banc Auto as part of the Settlement Agreement and potential payments made by Figueroa to Banc Auto as part of Figueroa's agreement with the Lancaster County District Attorney.**

¶ 10 Because the insurance proceeds paid to Banc from Empire must be repaid to Empire both as a collateral source and under the terms of the settlement, these need not be deducted from the figure. The Court's order requires an offset for any sums received by Figueroa, so this was considered by the trial judge.

**6. The Court failed to enter a decision in favor of Euro and against Banc Auto.**

¶ 11 This is simply a catch-all claim, apparently based on all the prior claims. A detailed discussion of the issues follows.

**1. The Court erred in finding that Banc was the lawful owner of the Mercedes and therefore that bank was entitled to monetary damages.**

■ ¶ 12 It will be helpful here to start with a discussion of the difference between a void title and a voidable title. *In Re Hennessy, supra,* provides guidance. In order to possess voidable title, one must obtain goods through the assent of the original owner, but not necessarily acquire

good title. *Id.* at 856. Void title, on the other hand, derives from a situation where the goods were not obtained through the assent of the original owner. *Id.* In common application, this means if goods are stolen and resold, no good title can be transferred because the thief has never had proper title to the goods and so cannot pass good title to another. However, if the goods are obtained through the consent of the original owner, even though that original owner may have been fraudulently induced to part with the goods,[1] title is merely voidable and a buyer in good faith may still obtain title to the goods.

¶ 13 Euro's claim here is essentially that it still held legal ownership of the car because it still held title to the car, never having transferred that title to either Figueroa or any other entity. Euro cites to a number of cases, including: *Majors v. Majors,* 153 Pa.Super. 175, 33 A.2d 442 (1943); *Stonebraker v. Zullinger,* 139 Pa.Super. 134, 11 A.2d 698 (1940); and *Commercial Banking Corp. v. Active Loan Co. of Philadelphia,* 135 Pa.Super. 124, 4 A.2d 616 (1939). Euro also cites the Motor Vehicle Code, 75 Pa.C.S. §§ 102, 1111, and 1113, to support this proposition.

¶ 14 The case law cited by Euro stands for the general proposition that to own, and therefore have the ability to dispose of, an automobile, a person must have title to the automobile. The Motor Vehicle Code sections simply give instruction how title is transferred, as in what forms must be filled out and when such forms should be filed. We have no argument with the general proposition put forth by Euro; certainly title to vehicle eventually must be transferred to the new owner. Rather, it is in the application of the general principle to the specific facts of this matter where Euro runs afoul.

[1] 13 Pa.C.S. § 2403(a). This concept is discussed in more detail later in this decision.

¶ 15 The cases cited by Euro all predate Pennsylvania's adoption of the Uniform Commercial Code (the Code). While the Code does not specifically alter the notion that title is an important factor in determining ownership, it did alter notions of how and when title passes from seller to purchaser.

¶ 16 Regarding the power to transfer, 13 Pa.C.S. § 2403 states, in relevant part:

(a) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest, acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:

(1) the transferor was deceived as to the identity of the purchaser;

(2) the delivery was in exchange for a check which is later dishonored; or

(4) the delivery was procured through fraud punishable as larcenous under the criminal law.

(b) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him the power to transfer all rights of the entruster to a buyer in the ordinary course of business.

13 Pa.C.S. § 2403.

¶ 17 The Code further describes the passing of title in section 2401(2):

Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time and place, and in particular and despite any reservation of a security interest by the bill of lading.

13 Pa.C.S. § 2401(2).

■ ¶ 18 Reading these sections of the Code together, it is apparent that Euro transferred, at a minimum, voidable title to Figueroa when it delivered the Mercedes to him pursuant to their sales agreement.[2] The fact that Euro claims to have been deceived as to the ultimate purchaser is immaterial, as is any contention that Figueroa obtained the car through a fraud which was punishable under the criminal law. Once Euro voluntarily delivered the car to Figueroa, Figueroa obtained the title, despite not having any document of title, and was free to dispose of the car to a buyer in good faith. Thus, Euro's argument that it was still the legal owner of the car fails.

**2. The Court erred in failing to find that Figueroa unlawfully converted or stole the Mercedes from Euro and therefore he could not pass legally cognizable title to Banc Auto.**

■ ¶ 19 There was no showing in the court below as to when Figueroa formed

---

**2.** There is no clear evidence as to when Figueroa formed his intent to defraud. He may have obtained the vehicle from Euro with every intention of following through on a legitimate transaction, in which case it would appear that Figueroa obtained good title upon receiving the car. If Figueroa intended to obtain the vehicle from Euro by fraud, title still passes to Figueroa, although that title is now considered voidable. Because of the specific facts of this case, the status of the title, whether it is good or voidable, does not alter the analysis or outcome.

his larcenous intent. It may well be that at the time he took possession of the Mercedes from Euro, Figueroa planned to go through with a legitimate transaction. While a court may have been able to infer that Figueroa intended to steal from Euro, the evidence does not mandate that finding. In fact, Figueroa was convicted of stealing the check, not the car. While it is legally possible for Figueroa to have stolen both the car and the check, it remains that he was not convicted of both.

¶ 20 As noted above, title passed to Figueroa when Euro delivered the car to Figueroa, even though he may have deceived Euro in obtaining the vehicle and despite any security interest Euro may have had in the car. As such, Figueroa could pass legally cognizable title to a buyer in good faith.

**3. The Court erred in finding that Banc Auto was a good faith purchaser for value without notice of a defect in title.**

¶ 21 The trial court determined that transactions such as those found in this matter are common in the trade and our review of the record confirms that determination. Euro had used Figueroa in the same capacity many times prior to this transaction. Banc Auto was also familiar with Figueroa. This method of transferring cars from one dealer to another seems, to our untrained eye, to largely be a matter of trust. Euro delivers a car to a middleman via a sales contract and trusts to be paid when the middleman is paid. The ultimate purchaser receives the vehicle from the middleman confident that documentary title will be delivered from the original seller after paying the middleman.

The middleman trusts the ultimate seller to deliver to him a percentage of the sales price. This system appears to work the vast majority of the time, or else it would have been replaced by a more reliable system.

¶ 22 Figueroa simply took advantage of the trust built into this system. From our review of the record, no one had any reason to distrust the transaction until Figueroa personally cashed the check made out to Car Mart.

¶ 23 The Code defines "good faith" as "[h]onesty in fact in the conduct or transaction concerned." 13 Pa.C.S. § 1201. Black's Law Dictionary[3] defines a *bona fide* purchaser as one who buys something for value without notice of another's claim and without actual or constructive notice of any defect in title. It further states that generally, a *bona fide* purchaser's[4] rights to the property are not affected by the transferor's fraud against a third party. There is no evidence that Banc Auto ever acted in any way other than honestly concerning this transaction, nor is there any evidence to show that Banc should have been in any way suspicious of this transaction as opposed to the myriad of other similar transactions.

**4. The Court created a windfall for Banc Auto by allowing it to recover the full amount of its alleged monetary loss ($56,500) plus retaining the value of the possession and use of the Mercedes (around 20,500 miles) during the period of time from when it was in possession of the car and until the Court ordered the sale (1–1/2 year period).**

¶ 24 Had there been any evidence of specific amounts of depreciation attrib-

---

3. Eighth Edition, West Publishing, 2004.

4. Black's indicates a *bona fide* purchaser equates to a good faith purchaser.

utable to Banc's use of the car, Euro's argument would carry more weight. This is not a situation where Euro presented testimony that a Mercedes–Benz S430 depreciates at 'x' number of cents per mile and then the trial court ignored the evidence. The record is devoid of any specific amount of depreciation of the car due to use. As a result, any attempt by the trial court to take Banc's use of the car into account would necessarily be based upon speculation. *See Detterline v. D'Ambrosio's Dodge, Inc.,* 763 A.2d 935 (Pa.Super.2000) (jurors must be provided with reasonable amount of information sufficient to estimate damages without speculation). Because Euro presented no evidence regarding the depreciation of the Mercedes, Banc cannot be considered to have received a windfall for failing to take depreciation into account.

**5. The Court failed to consider payments made from Empire to Banc Auto as part of the Settlement Agreement and potential payments made by Figueroa to Banc Auto as part of Figueroa's agreement with the Lancaster County District Attorney.**

¶ 25 This argument is clearly erroneous. The evidence presented showed the money paid to Banc by its insurer, Empire, was subject to repayment pursuant to the subrogation interest of Empire. Thus, Banc does not receive a double payment as a result of this award. Also, the trial court's order requires an offset for any sums received from Figueroa, so this issue was both considered by the trial court and addressed by the trial court.

**6. The Court failed to enter a decision in favor of Euro and against Banc Auto.**

¶ 26 This argument appears to be a catch-all, simply encompassing all the prior arguments. Because Euro is not entitled to relief on the other issues, the catch-all fails as well.

¶ 27 Judgment affirmed.